IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

SHERMAN DIVISION


AMANDA DOYLE, #1224970                    §

VS.                                       §                    CIVIL ACTION NO. 4:07cv540

DIRECTOR, TDCJ-CID                        §


REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE

Petitioner Amanda Doyle, an inmate confined in the Texas prison system, filed this petition

for writ of habeas corpus pursuant to 28 U.S.C. § 2254 with the assistance of counsel. The petition

was referred for findings of fact, conclusions of law, and recommendations for the disposition of the

case.


Background

Petitioner is complaining about her Denton County conviction for capital murder, Cause

Number F-2002-1651-E. On February 20, 2004, a jury found her guilty, and because the State did

not seek the death penalty, Petitioner was sentenced automatically to life in prison. The Second

Court of Appeals affirmed her conviction on January 5, 2006, *Doyle v. State*, No. 02-04-00164-CR

(Tex. App.–Fort Worth, Jan. 5, 2006). The Texas Court of Criminal Appeals refused her petition

for discretionary review (PDR) on February 2, 2006. It then denied her state writ of habeas corpus

without written order on the findings of the trial court without a hearing on November 21, 2007. *Ex*

*parte Doyle*, Application No. 68,698-01, at cover. May 30, 2003.

Petitioner filed the present federal petition, asserting she is entitled to relief based on suppression of evidence in violation of *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed.2d 215 (1963), and ineffective assistance of counsel on appeal.

## Statement of Facts

The Second Court of Appeals set out the factual background of this case:

### A. Non-Accomplice Witness Testimony

Cartrage Jones testified that on September 15, 2002, a group of his friends, including Dale Ponce-Duron, Kesey Frank, Justin Ebert, Jerry Jackson, and Jackson's girlfriend, Stephanie Tacina – gathered at the Mack Park Apartments to drink and watch a football game. Jerry and Stephanie argued, and Jerry shook Stephanie by the shoulders, causing her to hit her head on a wall and to fall to the ground. Cartrage said that Stephanie did not seem to be badly hurt. Jerry subsequently left with "the guys" to go to the store to buy beer. When the men returned to the apartments, they saw fire trucks, an ambulance, and police cars. Police eventually arrested Jerry.

Cartrage said that Doyle, the mother of Jerry's baby, and Tymeshia Turner arrived in a white, four-door Hyundai and saw that Jerry was handcuffed. Cartrage stated that Doyle was upset by Jerry's arrest and blamed Stephanie for it. Cartrage testified that Doyle repeatedly said, "We're going to get that bitch." He stated that Dale, Kesey, Justin, and Tymeshia were also upset and that he thinks everyone in the group was saying that they were "going to get that bitch," meaning Stephanie. Cartage heard Doyle say that the group was going to the hospital to find Stephanie. He testified that he told Doyle "not to go up there messing with that girl," but Doyle did not listen to him. Doyle handed her baby to Kelley Hughes, a friend who lived at the Mack Park Apartments, and Dale, Kesey, Justin, Tymeshia and Doyle all got in Doyle's car and left.

Lacey Lee, the assistant manager of the Mack Park Apartments at the time of this incident, testified that she remembered hearing a female voice cussing or yelling in the late afternoon and later saw two police cars in the parking lot. She saw one gentleman in handcuffs and two females whom she had not seen before standing in the parking lot. She described the two females – one was black and skinny; the other was white, bigger, and had a baby in her arms. She also noticed a group of five people pacing and yelling profanity; she could tell that they were very angry about something. Lacey noted that after the police left, Doyle was very angry; she was yelling at the other female. Lacey said that Doyle was pacing and repeating, "We're going to get that bitch."

2

Ivan Holbert testified that his girlfriend on September 15, 2002 was Kelley Hughes and that he went to her apartment on that date. Cartrage told Ivan something that made him go outside. Once outside, Ivan saw the police run a warrant check and arrest Jerry because he had an outstanding warrant. He saw Doyle and said that she was crying and upset and wanted to know where Stephanie had been taken. Ivan said that he told Doyle to leave Stephanie alone and that Stephanie was not the reason for Jerry's arrest. Ivan recalled Doyle saying that if she found Stephanie, she was "going to beat her up." Ivan and Kelley kept Doyle's baby because Doyle, Tymeshia, Dale, Kesey, and Justin left in Doyle's car. Ivan testified that as Dale got into the car he said: "I put this on my HLV [high life villain] until I die. When I find Stephanie, I'm going to kill her." The group returned thirty minutes later to drop off a baby bag, and Doyle said that she would be back to get her baby the next day.

Kelley Hughes testified that she lived at the Mack Park Apartments in September 2002 and that she heard a thump outside during the late afternoon of September 15, 2002. After checking on her kids, she went outside and saw a lady, who was wearing denim shorts and a green shirt, lying on the ground. Kelley asked Kesey, a black man who was outside, what had happened, and he said that the girl had hit her head on the wall. Kelley took the girl into a nearby apartment, and the girl ended up leaving, walking towards the police station.

After Kelley went back to her apartment, she heard the sound of approaching alarms and sirens. Later, she saw that police had arrived and handcuffed Jerry, Kesey, and a white man. The police arrested Jerry but let the other men go. Kelley remembered that by this time Doyle and Tymeshia had arrived in a white four-door car and she said they were present when Jerry was arrested. Kelley said that Doyle and Tymeshia were mad and upset and that Doyle wanted to know why Jerry had been arrested. Kelley stated that people in the group were yelling that they were going to beat up Stephanie. The group left, and Kelley kept Doyle's baby. Kelley did not hear anyone say that he or she was going to kill Stephanie.

Reese Morgan testified that on the night in question, he went to Denton to hang out with Jerry. He could not find Jerry, so he eventually called Doyle. Doyle returned Reese's call while she was with the group. Doyle told him that Jerry had been arrested and "that something bad had happened." Doyle was worried that her mom might call Reese looking for her and asked Reese to tell her mom that she and her friends had been with Reese because she did not want her mom to find out that Jerry was in jail. The next day, Reese gave Doyle $900 for Jerry's bail.

Tasia Hoffman testified that she is Doyle's friend and that she stayed at Doyle's house the night of September 14, 2002. The next day around 2:00 or 3:00 p.m.,

Doyle, the baby, and Tymeshia took Tasia home. Around 11:30 p.m., on September 15, 2005, Doyle knocked on Tasia's bedroom window. Tasia went to the door and let Doyle in, and Doyle said, "Stephanie's in the car. Come outside and get your paper," which Tasia understood to mean, "Come outside and fight her." Doyle told Tasia to look at her hands; Tasia saw that Doyle's knuckles were red with blood.

They went outside to Doyle's car; Tymeshia was in the driver's seat and Justin, Kesey, Dale, and Stephanie were in the back seat. Tasia saw Stephanie and asked what had happened. Tymeshia responded that Stephanie had gotten Jerry "locked up." Tasia noticed that Stephanie's head was on the seat between Dale and Kesey and that she was wearing bleached denim shorts and a green halter top. Tasia saw that Stephanie's hair was orange, like it had blood in it, and that she had bruises, a burn, and whelps on her back. Tasia thought that Stephanie "looked like somebody was holding onto her, not letting her move[,] like she was trying to move[,] but she couldn't." Tasia thought that Stephanie sounded like she was trying to breathe and was gasping for air. Tasia said that Doyle asked her if they could leave Stephanie at Tasia's house, and Tasia told her no. Doyle then asked Tasia to come with them, but Tasia's dad came outside and told her to go inside. Doyle got in the car, and the group left.

Tasia said that Doyle called her two or three times the next day. Doyle came to Tasia's house at around midnight the next day. Tasia noticed that Doyle was distraught, in shock, and scared when she arrived. They went to see if Stephanie's body was still at a nearby trailer park where Doyle said the group had dumped it. Tasia said that she did not look at the body; she covered her head with her shirt. Doyle said, "Oh, my God, she's still there," and then she started crying and said that Stephanie was dead. Tasia stated that Doyle did not want Stephanie to die.

Doyle then told Tasia about the events from the night before, including that Stephanie had been hit in the head with a brick and beaten and that the men in the back seat with Stephanie had burned her with cigarettes, choked her, and hit her with a gun. Doyle told Tasia that she had hit Stephanie. Doyle told Tasia that Kesey and Dale had dragged Stephanie out of the car by a belt, cut her throat, and stabbed her in the stomach with scissors. Doyle said that Kesey had tried to break Stephanie's neck. Doyle told Tasia that they took the padding out of her car seats because they were bloody, that they obtained bleach from a friend named Brian Dunnelly so that they could clean the car, and that they burned all the "stuff."

After going out to the vacant lot near the trailer park with Doyle, Tasia called her ex-boyfriend, Calvin. Calvin and his friend Dwayne arrived at Tasia's about 3:00 a.m., and the three of them went to look at Stephanie's body. Calvin then called the police.

Detective Eddie Barrett testified that he received a deceased persons call on September 17, 2002. He went to a vacant lot and found a deceased female wearing blue jean shorts, lying next to a pile of dirt. He noticed that the victim had multiple

stab wounds in the abdomen, a large laceration on her neck, and some burn marks across her face. Detective Barrett spoke with Calvin, Dwayne, and Tasia and developed a list of suspects. Detective Barrett also spoke with Doyle and obtained consent to search her white Hyundai. He subsequently sent the car to be searched for any hair, blood, and fingerprints that might be present. At Dale's house, Detective Barrett found a piece of landscape brick and a grill. He found another piece of landscape brick at Denton Regional Hospital. He noted that the hospital surveillance tape showed Dale, Tymeshia, and Doyle at the hospital.

Detective Chris Kemp testified that he responded to a dispatch on September 17, 2002 regarding a deceased person. He testified that Stephanie had a very deep laceration from one side of her neck to the other side, numerous puncture wounds to her stomach area, and bruising on her arms. He also saw the four-door pearl white Hyundai owned by Doyle. Detective Kemp said that there was enough blood in the back seat area of the vehicle to cause him to suspect that Stephanie had been killed in the vehicle rather than in the field where her body was discovered.

Constance Patton, a forensic DNA analyst, testified that she analyzed the vehicle for blood stains. She stated that the blood stains in the car matched Stephanie's blood profile and concluded that Stephanie was the donor of the blood found in Doyle's Hyundai. Patton noted that no blood was recovered from the front seat and that no blood was detected on the bricks.

Patricia Eddings, also a trace analyst, testified that the brick found at the hospital had no hair attached to it but that the brick found in Dale's backyard had a single hair stuck to it. She stated that the hair on the brick from Dale's backyard had the same microscopic characteristics as Stephanie's hair, and she opined that the hair on the brick could be Stephanie's.

Dr. Gary Sisler, who works at the Tarrant County Medical Examiner's Office, testified regarding his autopsy on Stephanie's body. He found a large cut wound on Stephanie's neck, other cut wounds on the left side of her neck, two cut wounds on the left side of her head, and bruises on her upper and lower extremities. He described the large cut wound on Stephanie's neck as seven inches wide and an average of one and a half inches deep. He said that the large cut wound was fatal in and of itself, that scissors could have caused the wound, and that the wound was inflicted while Stephanie's heart was still beating. He said that he found eleven stab wounds, averaging four and a half inches deep, that were inflicted after her heart stopped. Dr. Sisler explained that one of these stab wounds penetrated Stephanie's abdominal aorta and would have been fatal. He noted a burned area on Stephanie's face. Dr. Sisler did not note any cigarette burns in his report; however, he concluded at trial that Stephanie had suffered cigarette burns to her face because autopsy photos show the burned skin cracking and flaking. Dr. Sisler described the blunt-force injury to Stephanie's skull and opined that a brick could have caused that injury. He said that there was no evidence that Stephanie was choked with a belt or strangled with

a shirt because he found no marks on her neck. He indicated, however, that the autopsy would not have detected efforts to break Stephanie's neck. He ruled Stephanie's cause of death as multiple sharp-force injuries and indicated that the manner of death was homicide.

## B. Accomplice Witness Testimony

Tymeshia Turner was the final witness and the only accomplice witness who testified. FN1. Tymeshia testified that she was best friends with Doyle and went to school with her. Before September 15, 2002, Tymeshia had heard Doyle make threats against Stephanie; specifically, Doyle wanted to fight Stephanie and "get her out of the picture" because Doyle wanted to be with Jerry, who was dating Stephanie but was the father of Doyle's baby.

> FN1. At the conclusion of the State's direct examination, Tymeshia admitted that she had lied in previous statements to the police to protect herself, Doyle, and Justin. She stated that she came to testify at trial because she wanted to take responsibility for her actions.

On September 15, 2002, Tymeshia was with Doyle, and they went to find Jerry because he was not returning Doyle's pages. When they got to the Mack Park Apartments, they saw that Jerry was handcuffed. Tymeshia stated that Doyle was really mad and upset "because [Jerry] was over there [at the Mack Park Apartments] with Stephanie" and that because "he put his hands on Stephanie, he was going to jail, so it was all her fault." Doyle told Tymeshia, "I'm going to kill that bitch"; however, Tymeshia claimed that she did not know that Doyle meant it. During this time, Tymeshia, Dale, and Kesey said things to incite Doyle so that she would fight Stephanie. Doyle left her baby with Kelley and Ivan, drove the group in her car to her house to get baby things to take back to Kelley, and then planned to go to the hospital to fight Stephanie.

Tymeshia testified that Doyle drove them to Denton Community Hospital, but Stephanie was not at that hospital. Afterwards, they stopped at Kesey's grandmother's house, and Kesey came out with a gun, which turned out to be a pellet gun. Justin stated to the group that he would pistol-whip Stephanie with it. Then, the group went to Denton Regional Hospital and found out that Stephanie was there. Tymeshia told Doyle to wait in the car because Tymeshia did not think that Stephanie would come with them if she saw Doyle. Tymeshia went to Stephanie's hospital room and told her that Jerry was in jail. Tymeshia said that Jerry told her and Dale to come to the hospital and get Stephanie. Dale stayed with Stephanie at the hospital; Tymeshia drove the group around in Doyle's car, waiting for Stephanie to be

discharged. After getting money, gas, and cigarettes, the group discussed where they would take Stephanie. Justin mentioned a trailer park near the hospital, and they went there to get a brick to use to knock out Stephanie. Tymeshia confirmed that this conversation was held while Doyle was present.

Doyle suggested a plan for how Tymeshia could pick up Stephanie; Tymeshia would drop off Doyle, Justin, and Kesey at the hospital entrance, pick up Stephanie from the hospital, and then pick up the group on the way out. The group enacted this plan, and as soon as everyone was in the car, Kesey started punching Stephanie "really hard." Doyle, who was in the front passenger seat, turned around to watch and told Tymeshia to drive towards the highway. Tymeshia turned up the music while Kesey was hitting Stephanie, and Doyle turned down the music. Doyle said, "No, I want to hear this bitch scream." Tymeshia testified that all three men were punching Stephanie. Doyle yelled at Stephanie and told her that she needed to apologize to Doyle's baby, that she had warned Stephanie "about fucking with Jerry," and that Jerry had sent them to do this to her. Stephanie said that she was sorry and that she was not going to mess with Jerry anymore. Doyle turned around and started hitting Stephanie, punching her "head and stuff." Tymeshia testified that Kesey burned Stephanie with a cigarette and that Dale burned Stephanie with a lighter. FN2. Dale and Kesey placed a belt around Stephanie's neck and choked her.

> FN2. On cross-examination, Tymeshia admitted that she never saw Stephanie being burned, but she remembered Dale saying that he burned Stephanie in the eye.

They drove around for an hour or more, looking for a place to drop off Stephanie. Doyle suggested Tasia's house. Tymeshia said that when they arrived at Tasia's, Stephanie was not responding and seemed unconscious. Tymeshia mentioned that Tasia was going to "get her paper," which was Doyle's phrase. However, Tasia's dad came out and told Tasia that she could not leave.

Doyle told Tymeshia where to drive, and they ended up at a field near a trailer park. Everyone got out of the car, and Dale drug Stephanie out of the car by a belt placed around her neck and laid her face down behind a dirt pile. Kesey stepped on Stephanie's back and shoulders, and Dale tried to break Stephanie's neck. Tymeshia saw Justin stomping on Stephanie. Kesey took off Stephanie's shirt and wrapped it around her head, and both Kesey and Dale used the shirt to try to twist Stephanie's neck. Kesey said, "The bitch won't die." So, they turned over Stephanie, and Doyle retrieved a pair of cosmetology scissors from her car. Doyle handed the scissors to Dale, and he started stabbing Stephanie. Dale stabbed Stephanie's throat and began cutting her throat. Tymeshia heard air release when Dale cut Stephanie's windpipe.

Someone said that Stephanie was dead, and the group got back in the car. As Doyle drove away, the group realized that they did not have Stephanie's hospital band; they went back, and Dale retrieved it. During the drive to Doyle's house, Tymeshia recalled that Doyle told them not to worry about it – "nobody['s] going to find out"; "it's over and done."

When they arrived at Doyle's house, Dale and Kesey took showers because they were soaked in Stephanie's blood. Tymeshia used a bag to gather up everyone's clothes and shoes, along with Stephanie's shirt and hospital band, and the scissors. They all went to a car wash to clean out the car, and Tymeshia saw a lot of blood on the back seat. The next day, they used bleach and a powder cleaner from Brian's house to clean the car. Dale and Justin took out the backseat of the car and cut out the seatbelts. Tymeshia threw the landscape brick in Dale's backyard and they used the barbecue grill to burn everything in the bag that they had collected the day before. The next time that Tymeshia saw Doyle, Doyle told her about taking Tasia to see if Stephanie was dead.

Tymeshia said that when this chain of events started, she did not expect Stephanie to die; all along, the plan was for a fight, and there was never any talk of killing Stephanie. However, Tymeshia confirmed that throughout the ordeal Doyle never indicated she was having second thoughts about Stephanie's beating.

*Doyle*, slip op., No. 02-04-0164-CR, at * 2-15.

Additionally, the state habeas court made the following findings of fact based on the record (citations omitted herein) and relevant law:

1.  A jury convicted Applicant of capital murder, and because the State did not seek the death penalty, the trial court automatically assessed a life sentence.

2.  The Second Court of Appeals affirmed the trial court's judgment, and the Court of Criminal Appeals denied her petition for discretionary review. *See Doyle v. State,* No. 02-04-00164-CR, 2006 WL 20401 (Tex. App.–Fort Worth 2006, pet. ref'd).

3.  This is Applicant's first application for a writ of habeas corpus. In her application, she alleges that (1) the State suppressed evidence that an accomplice witness would receive leniency in exchange for her testimony and used her perjured testimony that she would not receive leniency, thereby denying her due process of law and a fair trial, and (2) her appellate attorney denied her effective assistance of counsel.

4. At Applicant's trial, the State proved that in September 2002, five co-defendants, Applicant, Alberto Ponce-Duron, Kesey Frank, Justin Ebert, and Tymeshia Turner tortured and killed teenager Stephanie Tacina. They kidnapped her from a hospital, berated, punched, kicked, beat with a brick, burned with a cigarette or lighter, dragged and choked with a belt, tried to break her neck by stomping and twisting, and repeatedly used scissors to stab her belly. Tacina's throat was hacked open with a pair of Applicant's scissors. Turner drove Applicant's car. When she was killed, Tacina was seeing Applicant's former boyfriend by whom Applicant had a two-month-old infant. The intermediate court held the evidence factually sufficient to support Applicant's guilt as a party or co-conspirator to capital murder. *See Doyle*, 2006 WL 20401 at *5-8.

5. In December 2002, all co-defendants, except Ebert, were charged with capital murder. Ebert was charged with aggravated kidnapping.

6. The trials of the co-defendants occurred over six months. First, Denton County Assistant District Attorneys Michael Moore and Paige McCormick tried Ponce-Duron. Jim Horton represented Ponce-Duron. In August 2003, a jury convicted Ponce-Duron of capital murder and, automatically, the trial court assessed a life sentence.

7. Second, Denton County Assistant District Attorneys Paige McCormick and Kristin Kidd tried Kesey Frank. Keith Orsburn represented Frank. In December 2003, a jury convicted Frank of capital murder and automatically, the trial court assessed a life sentence.

8. Third, Denton County Assistant District Attorneys Michael Moore and Kristin tried Applicant. Lalone Peale and Gary Unell represented Applicant. In February 2004, a jury convicted Applicant of capital murder, and automatically, the trial court assessed a life sentence.

9. Fourth, in March 2004, Ebert pleaded guilty to aggravated kidnapping and was assessed sixteen years' incarceration. Kevin Hinzman represented Ebert.

10. Fifth, in April 2004, Turner pleaded guilty to a lesser charge of aggravated kidnapping and was assessed fifteen years' incarceration. Derek Adame represented Turner.

**Turner's participation in Applicant's trial**

11. In July 2003, before the first co-defendant's trial, Moore relayed to Adame that he would offer Turner thirty years in exchange for her pleading guilty to

a lesser offense. Turner rejected this offer.

12. When the court settings in all the cases began in January 2003, Adame repeatedly approached Moore to offer Turner's cooperation. Consistently until December 2003, Moore declined the offers.

13. After Frank's trial, in December 2003, though, Adame approached Moore about an inconsistency between Ebert's and Turner's versions of the person who obtained a landscape brick used to beat the victim and with new information about the identity of two witnesses. While Moore agreed to meet Turner, he did not offer any benefit to Turner in exchange for her information.

14. Turner, Kidd, and investigator Ed Tober met Turner and Adame on December 19, 2003, at the Denton County Jail. Moore explained that he was offering nothing in exchange for her cooperation and she was going to prison. Turner acknowledged this and advised she wanted to take responsibility for her role. She identified two previously unknown witnesses, Reese Morgan and "B.K." Tober subsequently met Morgan, and Morgan verified Turner's information. Morgan testified against Applicant.

15. More significantly, Turner revealed that, contrary to Ebert's testimony at Frank's trial, Frank obtained the landscape brick used to beat the victim, Ebert had picked up the brick. Moore, Kidd, and Tober confronted Ebert with Turner's revelation in the presence of his attorney. Ebert admitted lying and falsely testifying at Frank's trial. Moore turned over this exculpatory evidence to Frank's attorney, Orsburn, and this Court.

16. In February 2004, Moore, Kidd, and Tober met with Turner and Adame to discuss Turner's testimony at Applicant's upcoming trial. Moore promised nothing in exchange for Turner's testimony. He told Adame he would not make any deals or offers in exchange for Turner's testimony.

17. Turner testified at Applicant's trial without any immunity. Her testimony was consistent with the information she had previously given the State.

18. At Applicant's trial, Moore assured the Court that no offers had been made or agreements reached with any of the co-defendants in exchange for their testimony. The defense also acknowledged that it was aware of Ebert's prior perjury.

19. Before she testified, Turner confirmed to the trial court that she had not been promised anything in exchange for her testimony. At the conclusion of her

direct examination, she testified that she had not been promised, or agreed to, anything in exchange for her testimony. During cross-examination, she confirmed that she had been offered thirty years prison previously. Also, she did not expect any favorable treatment as a result of testifying.

20. After Applicant's trial and listening to the persuasive arguments of Adame, Moore reached a plea bargain agreement with Adame. The State agreed to a reduced sentence of one year less than Ebert's because Ebert had committed perjury and Turner had cooperated. Turner pleaded guilty to aggravated assault and received a fifteen-year sentence.

21. Moore, Kidd, McCormick, Tober, and Adame all agree that Turner was not offered or promised, and did not agree to, any favorable treatment in exchange for her testimony against Applicant. Also, no implicit or "under the table" offers, promises, or agreements existed. Any expectation that Turner would obtain any benefit from her cooperation was fostered by Adame; not the State. By reputation and from personal experience, the Court finds each of these witnesses credible.

22. To prove Applicant guilty of capital murder, the State did not require the assistance of Turner. The State already had the cooperation of Ebert – the least culpable co-defendant. Also, Turner did not testify at either Ponce-Duron's or Frank's trials. The State did not approach Adame about Turner's cooperation.

23. Adame, on behalf of Turner, repeatedly approached the State in an attempt to mitigate Turner's sentence. Even after Applicant's trial, Adame did not know Turner would enjoy a reduced offer from the State. He simply trusted Moore to consider Turner's cooperation in extending a favorable offer. Plea bargaining began only after Applicant's trial, and Adame had to persuade a reluctant Moore to give leniency.

24. In his supplemental affidavit, Adame has not recanted his previous affidavit. He has simply explained, in his own words, without leading from Applicant's attorneys, the events that actually occurred and enjoyed further opportunity to review his notes and employ personal recollection. Adame is credible.

25. The State fully disclosed the nature of its relationship with Turner.

**Appellate counsel's representation**

26. The Court originally appointed Jerry Parr to represent Ponce-Duron, and Applicant retained Henry "Hank" Paine, Jr. Paine worked with Hammerle

Finley Associates. Parr then accepted a position with Hammerle Finley Associates, and identifying a potential conflict of interest, he filed a motion to withdraw from Ponce-Duron's case.

27. Although the Court held a hearing on the motion to withdraw on March 13, 2003, the Court did not rule on it because of the possibility that Paine would be appointed to the bench of the 16th District Court. On April 16, 2003, the court granted the motion.

28. Concerned about a conflict of interest affecting the trials of any of the co-defendants' cases and subsequent claims by either Ponce-Duron or Applicant that their defenses had been hampered by the conflict of interest, the State filed a motion to disqualify Paine. The motion was filed before any of the trials began.

29. At a hearing on the State's motion to disqualify, Parr confirmed that Ponce-Duron did not waive any conflict of interest involving Parr.

30. James H. Horton, who took over the representation of Ponce-Duron, believed that there was a potential conflict of interest between his client's case and Applicant's case and advised his client not to waive any potential conflict. Although he did not file a motion to disqualify because he had not thought about the possibility, he would have done [so] if the issue had arisen.

31. At the hearing, Ponce-Duron declined to waive any conflict of interest that arose between him and Applicant. He would not permit anything he told Parr to be used against him at Applicant's trial.

32. Applicant signed a sworn waiver of any potential conflict of interest. Despite expecting zealous advocacy from her counsel, she signed the waiver on the advice of counsel, although she was not sure if she was aware of any potential conflicts of interest.

33. The prosecutors did not seek the disqualification to obtain any improper advantage, [but rather] to protect their convictions.

34. The Court finds that the Applicant's grounds for relief lack merit and recommends relief be denied.

## CONCLUSIONS OF LAW

### Claim of Suppression and Perjury

1.  To fulfill due process, the State must affirmatively disclosed evidence that is both favorable to the accused and material either to guilt or to punishment. *See United States v. Bagley*, 473 U.S. 667, 674-75 (1985); *Brady v. Maryland*, 373 U.S. 83 (1963). The *Brady* rule contemplates both exculpatory evidence and impeachment evidence. *Bagley*, 473 U.S. at 676.

2.  The State's knowing presentation of false evidence to obtain a conviction violates due process. *See United States v. Agurs*, 427 U.S. 97, 108 (19769); *Napue v. Illinois*, 360 U.S. 264 (1959) (principal prosecution witness falsely testified that he had been promised no consideration for his testimony).

3.  Even when presented with conflicting affidavits, a trial court need not hold a live hearing. *See Manzi v. State*, 88 S.W.3d 240, 244 (Tex. Crim. App. 2002) (conflicting affidavits at pretrial suppression hearing). This is especially true if a court is presented with conflicting affidavits and the court is familiar with the prior proceedings and the respective partes. *See Holden v. State*, 201 S.W.3d 761, 764 (Tex. Crim. App. 2006) (conflicting affidavits from defendant and trial counsel on motion for new trial).

4.  The Court can adequately assess the credibility of the affiants. No live hearing is required.

5.  The State did not violate due process by suppressing favorable and material evidence or by sponsoring perjured testimony.

### Claim of ineffective assistance of counsel

6.  The failure of counsel to provide adequate representation on appeal as required by the Sixth Amendment can render a trial so fundamentally unfair as to violate the Due Process Clause of the Fourteenth Amendment to the Untied States Constitution. *See Evitts v. Lucey*, 469 U.S. 387, 396 (1985).

7.  An appellate lawyer need not advance every argument urged by his client. *See Evitts*, 469 U.S. at 828; *Jones v. Barnes*, 463 U.S. 745 (1983).

8.  A defendant may be denied effective assistance of counsel because his trial lawyer was hampered by a conflict of interest. *See Cuyler v. Sullivan*, 446 U.S. 335, 345-50 91980); *Holloway v. Arkansas*, 435 U.S. 475 (1978).

9.    A court confronted with and alerted to possible conflicts of interest must take adequate steps to ascertain whether the conflicts warrant separate counsel. *Wheat v. United States*, 486 U.S. 153, 160 (1988).

10.   Most courts grant an attorney's request for appointment of another counsel, based upon his representations as an officer of the court regarding a conflict of interest. *See Holloway*, 435 U.S. at 485. The courts usually "presume that [a] lawyer is fully conscious of the overarching duty of complete loyalty to his or her client" and "necessarily rely in large measure upon the good faith and good judgment of defense counsel." *Burger v. Kemp*, 483 U.S. 776, 784 (1987).

11.   A court may even decline a proffer of a waiver of any actual conflict of interest and insist that defendants be separately represented. *See Wheat*, 486 U.S. at 160.

12.   Before trial, a trial court must pass on the issue whether to allow a waiver of conflict of interest not with the wisdom after trial has occurred, but in the murkier pretrial context. *See Wheat*, 486 U.S. at 163.

13.   Trial courts should be permitted substantial latitude in refusing waivers of conflict of interest even in the more common cases where a potential for conflict exists, which may or may not develop into an actual conflict as trial proceeds. *See Wheat*, 486 U.S. at 163.

14.   The appointment of two law partners to represent co-indictees in their respective trials creates a possible conflict of interest that could prejudice either or both clients. *See Burger*, 483 U.S. at 783 (1987).

15.   Texas lawyers should decline representation when an impermissible conflict of interest exists before representation. See Tex. Disciplinary R. Prof'l Conduct 1.06, 1.15(a) and comments; ABA Model Rules of Professional Conduct Rule 1.7. *See also United States v. Phillips*, 952 F. Supp. 480 (1996).

16.   A claim on direct appeal challenging the trial court's ruling on the motion to disqualify would have had virtually no possibility of prevailing. Appellate counsel is not ineffective for failing to raise even every nonfrivolous claim on appeal. *Jones*, 463 U.S. at 751.

17.   Appellate counsel did not render ineffective assistance by failing to present the disqualification claim on appeal.

*Ex parte Doyle*, Application No. 68,698-01, at *275-284. The state habeas court made these findings of fact and conclusions of law based on the record in this case. The CCA then denied relief based on the state habeas court's findings and conclusions. State court findings supported by the record are owed deference by a federal district court. *Pondexter*, 346 F.3d at 149-152.

## Federal Habeas Corpus Relief

The role of federal courts in reviewing habeas corpus petitions by prisoners in state custody is exceedingly narrow. A person seeking federal habeas corpus review must assert a violation of a federal constitutional right. *Lowery v. Collins*, 988 F.2d 1354, 1367 (5th Cir. 1993). Federal habeas corpus relief will not issue to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also present. *Estelle v. McGuire*, 502 U.S. 62, 67-68, 112 S. Ct. 475, 479-80, 116 L. Ed.2d 385 (1991); *West v. Johnson*, 92 F.3d 1385, 1404 (5th Cir. 1996). In the course of reviewing state proceedings, a federal court does not sit as a super state appellate court. *Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir. 1986).

The prospect of federal courts granting habeas corpus relief to state prisoners has been further limited by the Antiterrorism and Effective Death Penalty Act of 1996. The new provisions of Section 2254(d) provide that an application for a writ of habeas corpus "shall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See Williams v. Taylor*, 529 U.S. 362,

402-03, 120 S. Ct. 1495, 1517-18, 146 L. Ed.2d 389 (2000); *Childress v. Johnson*, 103 F.3d 1221, 1224-25 (5th Cir. 1997). The statutory provision requires federal courts to be deferential to habeas corpus decisions on the merits by state courts. *Moore v. Cockrell*, 313 F.3d 880, 881 (5th Cir. 2002).

A decision by a state court is "contrary to" the Supreme Court's clearly established law if it "applies a rule that contradicts the law set forth in" the Supreme Court's cases. *Williams*, 529 U.S. at 405-06. A federal court's review of a decision based on the "unreasonable application" test should only review the "state court's 'decision' and not the written opinion explaining that decision." *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (*en banc*). "Under § 2254(d)(1)'s 'unreasonable application' clause, then, a federal habeas corpus court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. Rather, that application must be objectively unreasonable. *Id.* at 409. The standard is satisfied only if "reasonable jurists considering the question would be of one view that the state court ruling was incorrect." *Davis v. Johnson*, 158 F.3d 806, 812 (5th Cir 1998) (internal quotation marks and citations omitted).

The trial court's factual findings are entitled to a presumption of correctness unless the petitioner can rebut the presumption with clear and convincing evidence to the contrary. *Valdez v. Cockrell*, 274 F.3d 941, 947 (5th Cir. 2001). A federal district court must be deferential to state court findings supported by the record. *See Pondexter v. Dretke*, 346 F.3d 142, 149-152 (5th Cir. 2003). A state application that is denied without written order by the Texas Court of Criminal Appeals, as in the present case, is an adjudication on the merits. *Singleton v. Johnson*, 178 F.3d 381, 384 (5th Cir. 1999); *Ex parte Torres*, 943 S.W.2d 469, 472 (Tex. Crim. App. 1997) (holding a

"denial" signifies an adjudication on the merits while a "dismissal" means the claim was declined on grounds other than the merits).

<u>Brady Violation</u>

Petitioner alleges that the prosecution failed to disclose that an accomplice witness had an "understanding" of leniency with the State in exchange for her testimony, in violation of *Brady*. In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97, 10 L. Ed.2d 215 (1963). The prosecution "need not disgorge every piece of evidence in its possession . . . [but] has an affirmative duty to disclose to the defense evidence that is favorable to the accused and material to guilty." *Rector v. Johnson*, 120 F.3d 551, 558 (5th Cir. 1997). In addressing a *Brady* claim, the Fifth Circuit has explained that a defendant must prove:

      (1) the prosecution suppressed evidence;

      (2) the suppressed evidence was favorable to the defense; and

      (3) the suppressed evidence was material to the defense.

*Derden v. McNeel*, 938 F.2d 605, 617 (5th Cir. 1991). The test for materiality is whether there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id*. The materiality of the evidence is evaluated in light of the entire record. *See Lagrone v. State*, 942 S.W.2d 602, 615 (Tex. Crim. App. 1997). The Fifth Circuit also requires that a petitioner show that "discovery of the allegedly favorable evidence was not the result of a lack of due diligence. *Rector*, 120 F.3d at 558. The state does not have a duty to disclose information that is available from other sources. *Id*. at 559. Additionally, the mere

possibility that a piece of information might have helped the defense does not establish materiality in the constitutional sense. *Id*. at 562.

Petitioner fails to meet the first *Brady* element – that the prosecution suppressed evidence. Petitioner claims that the prosecution failed to reveal that the State had an "understanding" with Petitioner's accomplice witness, Turner. Specifically, she asserts that the prosecutor told Turner's attorney that "the more her testimony helped the State, the more he would take it into consideration in making a recommendation in her case." She then complains that Turner testified that she did not expect the State's original plea offer of 30 years to get better after she had testified. Petitioner points out that Turner ultimately pleaded guilty to a lesser included crime - aggravated assault - and was sentenced to only 15 years. However, Petitioner provides no evidence of an agreement between Turner and the Government. The state habeas court noted that Moore, Kidd, McCormick, Tober, and Adame all agree that Turner was not offered or promised, and did not agree to, any favorable treatment in exchange for her testimony. It also found that no implicit offers, promises, or agreements existed. While Petitioner attempts to discredit Adame, the state habeas court specifically found him to be credible. It also found that the State fully disclosed the nature of its relationship with Turner.

Furthermore, Petitioner has failed to show that the alleged suppressed evidence was material under *Brady*. When the reliability of a government witness may well be determinative of guilt or innocence, nondisclosure of evidence affecting the credibility of the government witness falls under *Brady*. *United States v. Williams*, 343 F.3d 423, 439 (5th Cir. 2003). In this case, the reliability of Turner would not be solely determinative of the guilt or innocence of Petitioner. The Government presented numerous witnesses that all gave evidence of Petitioner's guilt. Thus, Petitioner has not

shown that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Derde*n, 938 F.2d at 617.

The testimony given by Turner concerning Petitioner's guilt was corroborated by other witnesses's testimony. The record reveals that numerous non-accomplice witnesses heard Petitioner make a threat against Stephanie, that Petitioner provided the mode of transportation for the actions perpetrated against Stephanie, that hospital surveillance cameras show Petitioner at the hospital when they picked Stephanie up, that Tasia's testimony corroborated Turner's testimony that Petitioner hit Stephanie, that Tasia saw Stephanie in Petitioner's car in a badly beaten condition, and that Tasia saw blood on Petitioner's hands. The state habeas court found that the State did not require Turner's testimony to prove Petitioner guilty of capital murder based on the other evidence presented in this case. In essence, Petitioner has not show that there was a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Derden*, 938 F.2d at 617. Thus, there is no Fifth Amendment violation to due process rights under *Brady* because the evidence allegedly withheld was not material to the witness's credibility. *Id*.

Additionally, Petitioner has not shown that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Williams*, 529 U.S. at 402-03; *Childress*, 103 F.3d at 1224-25.

<u>Ineffective Assistance of Counsel on Appeal</u>

The Fifth Circuit has held that to prevail on a claim of ineffective assistance of counsel on

appeal, the petitioner must make a showing that had counsel performed differently, there would have been revealed issues and arguments of merit on the appeal. *Sharp v. Puckett*, 930 F.2d 450, 453 (5th Cir. 1991), *citing Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2065, 80 L. Ed.2d 864 (1984). In a counseled appeal after conviction, the key is whether the failure to raise an issue worked to the prejudice of the defendant. *Sharp*, 930 F.2d at 453. This standard has been affirmed by the Supreme Court. *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 764, 145 L. Ed.2d 756 (2000) (holding that the petitioner must first show that his appellate attorney was objectively unreasonable in failing to find arguable issues to appeal, and also a reasonable probability that, but for his counsel's unreasonable failure to file a merits brief raising these issues, he would have prevailed on his appeal). *See also Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed.2d 389 (2000); *Briseno v. Cockrell*, 274 F.3d 204, 207 (5th Cir. 2001).

Furthermore, an appellate counsel's failure to raise certain issues on appeal does not deprive an appellant of effective assistance of counsel where the petitioner did not show trial errors with arguable merit. *Hooks v. Roberts*, 480 F.2d 1196, 1198 (5th Cir. 1973). Appellate counsel is not required to consult with his client concerning the legal issues to be presented on appeal. *Id*. at 1197. An appellate attorney's duty is to choose among potential issues, using professional judgment as to their merits – every conceivable issue need not be raised on appeal. *Jones v. Barnes*, 463 U.S. 745, 749, 103 S. Ct. 3308, 3311-12, 77 L. Ed.2d 987 (1983).

In the instant case, Petitioner asserts that appellate counsel was ineffective when he failed to raise the issue on appeal that the trial court erred in granting the State's motion to disqualify trial counsel. However, as shown above, the CCA denied Petitioner's state writ based on the findings of the state habeas court. There, the state habeas court found that the prosecutors did not seek the

disqualification to obtain any improper advantage, but rather, to protect convictions. It found that appellate counsel was not ineffective for failing to raise this issue that had virtually no possibility of prevailing. It concluded that appellate counsel did not render ineffective assistance of counsel by failing to present the disqualification issue on appeal. State court findings supported by the record are owed deference by a federal district court. *Pondexter*, 346 F.3d at 149-152.

Petitioner has not shown that her appellate attorney was objectively unreasonable in failing to raise the disqualification issue on appeal. *Smith*, 528 U.S. at 285, 120 S. Ct. at 764. She also has failed to show that, but for her appellate counsel's alleged unreasonable failure to raise the issue, there was a reasonable probability that she would have prevailed on appeal. *Id*. Petitioner has failed to prove that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; 104 S. Ct. at 2068. She has failed to rebut the presumption of correctness owed to the trial court's factual findings with clear and convincing evidence to the contrary. *Valdez*, 274 F.3d at 947.

Additionally, Petitioner has not shown that the state court proceedings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. *Williams*, 529 U.S. at 402-03; *Childress*, 103 F.3d at 1224-25.

<u>Denial of Hearing During State Habeas Proceedings</u>

Petitioner also seems to assert that she was denied a forum to develop the facts and establish her innocence during the state habeas proceedings. However, it is well-settled that "infirmities in state habeas proceedings do not constitute grounds for relief in federal court," *Trevino v. Johnson*,

168 F.3d 173, 180 (5ᵗʰ Cir. 1999), or that alleged infirmities in state habeas proceedings cannot be grounds for federal habeas relief, *Moore v. Dretke*, 369 F.3d 844, 846 (5ᵗʰ Cir. 2004). Factual determinations made by a state court are reviewed for reasonableness in light of the evidence, and the state court's presumption of correctness is especially strong where the trial judge and the state habeas judge are the same. *Miller-El v. Johnson*, 261 F.3d 445, 454 (5ᵗʰ Cir. 2001) (rev'd on other grounds, 537 U.S. 322, 123 S. Ct. 1029, 154 L. Ed.2d 931 (2003)). The presumption of correctness applies not only to express findings of fact, but also to unarticulated findings that are necessary to the state court's conclusions of mixed law and fact. *Valdez*, 274 F.3d at 948 n. 11. Section 2254(e) states that if the applicant failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that the claim relies on (1) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court that was previously unavailable; or (2) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (3) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that, but for the constitutional error, no reasonable fact finder would have found the applicant guilty of the underlying offense. 28 U.S.C. § 2254 (e)(2).

Petitioner has not shown that her claims rely on a new rule of constitutional law or on a factual predicate that could not have been previously discovered through the exercise of due diligence. 28 U.S.C. § 2254(e)(2)(A). She has also failed to allege facts that would be sufficient to establish by clear and convincing evidence that, but for the alleged error, she would not have been found guilty of the underlying offense. *Id*., § 2254(e)(2)(B).

When presenting a claim in state court, an applicant must diligently develop the record and

present all possible claims of constitutional error, as shown by Section 2254(e)(2). *Williams v. Taylor*, 529 U.S. 420, 437, 120 S. Ct. 1479, 1491, 146 L. Ed.2d 435 (2000). If the applicant failed to diligently develop the record and present all possible claims, then he has contributed to the "absence of a full and fair adjudication in state court," and the federal court is prohibited from holding an evidentiary hearing to develop the relevant claims unless the applicant can meet the statute's other stringent requirements. *Id.* In the instant case, since the Texas Court of Criminal Appeals denied Petitioner relief on her claims based on the merits, Petitioner must show how the decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or that the decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d); *Williams*, 529 U.S. at 402-03, 120 S. Ct. at 1517-18; *Childress*, 103 F.3d at 1224-25.

In this case, the same judge presided over both Petitioner's trial and state habeas proceedings, warranting an especially strong presumption of correctness. *Miller-El*, 261 F.3d at 454. The judge made findings of fact and conclusions of law evidenced by specific, comprehensive written findings supported by and rooted in the trial record. Even if a "live" hearing was not held that included testimony from witnesses, the Fifth Circuit has held that a "hearing by affidavit" meets the purposes of Section 2254 because "the only procedural requirements that must be satisfied for there to be a hearing on the merits of a factual issue are: (1) the habeas applicant and the state or its agent must be parties to the state proceeding, and (2) the state court determination must be evidenced by a written finding, written opinion, or other reliable and adequate written indicia." *Smith v. Estelle*, 7117 F.2d 677, 681 (5th Cir. 1983) (citing *Sumner v. Mata*, 449 U.S. 539, 101 S. Ct. 764, 66 L. Ed.2d

722 (1981)).  A federal court must defer to the state court's findings when both requirements are met unless the hearing was inadequate under the circumstances or the findings are determined not to be fairly supported by the record.  *Id*.  In this case, both requirements were met, and Petitioner has not shown that the "hearing" was inadequate or that the findings are not fairly supported by the record.

The Fifth Circuit has repeatedly found that a "paper hearing" is sufficient to afford a petitioner a full and fair hearing on the factual issues underlying the petitioner's claim, especially where the trial court and the state habeas court were one in the same.  *Clark v. Johnson*, 202 F.3d 760, 766 (5th Cir. 2000).  Both Petitioner and the State were represented on "paper" during the state proceedings through various filings including affidavits, and the state court determination was evidenced by a written finding, written opinion, or other reliable and adequate written indicia.  *Smith*, 7117 F.2d at 681.  Petitioner has not shown that the state proceedings were inadequate under the circumstances or that the state findings are not fairly supported by the record.  *Smith*, 7117 F.2d at 681.  Moreover, the law in this circuit is clear that, in contrast to the pre-AEDPA law, deference to a state habeas court's factual determinations is not dependent upon the quality of the state court's evidentiary hearing. *See Valdez*, 274 F.3d 941.  In *Valdez*, the Fifth Circuit Court gave deference to the state habeas factual findings even where exhibits were lost and thus ignored by the state court, holding that "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review." *Id*. at 951.  The Fifth Circuit Court concluded that deference was owed unless the state findings were rebutted by clear and convincing evidence to the contrary.  *Id*.

Petitioner also claims that the state court's findings are not entitled to a presumption of correctness because of an alleged conflict of interest concerning Judge Gabriel.  Initially, the Court

notes that this issue is unexhausted as it was not raised in state habeas proceedings or in her PDR. *See Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985) (to satisfy the exhaustion requirement, a claim must be presented to the highest court of the state for review). Additionally, this claim would not be cognizable on federal habeas relief because it is an allegation of an infirmity in state proceedings. *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999). However, Petitioner asserts that Judge Gabriel's son was being prosecuted by Denton County District Attorney's Office (prosecution began several days prior to Judge Gabriel's adoption of the State's proposed findings and conclusions), and that a conflict of interest existed, requiring Judge Gabriel to recuse herself. Petitioner presents no evidence that Judge Gabriel's decisions concerning this case were tainted or unreliable. Conclusory claims are insufficient to entitle a habeas corpus petitioner to relief. *Woods*, 870 F.2d at 288; *Schlang*, 691 F.2d at 799. Petitioner has not rebutted the findings by clear and convincing evidence to the contrary. *Valdez*, 274 F.3d at 947.

Finally, Petitioner asserts that the State makes several arguments in support of the denial or habeas corpus relief that were not made in state court; accordingly, she claims that this Court may not consider them. However, a petitioner – not the State – is required to exhaust her claims. The State is simply responding to Petitioner's claims. Petitioner presents a Ninth Circuit case purported to be in support of her position, but fails to present a Fifth Circuit or United States Supreme Court case in support. This issue is without merit.

In sum, Petitioner has failed to rebut with clear and convincing evidence that the state habeas court's factual determinations should not be afforded the presumption of correctness. *Id*. A federal district court must be deferential to state court findings supported by the record. *See Pondexter*, 346 F.3d at 149-152. A state application that is denied without written order by the Texas Court of

Criminal Appeals is an adjudication on the merits. *Singleton*, 178 F.3d at 384; *Ex parte Torres*, 943 S.W.2d at 472. Petitioner also has not shown that she is now entitled to an evidentiary hearing on the matter. *United States v. Fishel*, 747 F.2d 271, 273 (5th Cir. 1984) (district court's denial of hearing not an abuse of discretion when it has sufficient facts before it to make an informed decision on the merits of Petitioner's claims). This issue lacks merit.

## Conclusion

Petitioner's issues presented in the instant writ are without merit. Petitioner has failed to prove that there is a reasonable probability that, but for counsel's alleged unprofessional errors, the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694; 104 S. Ct. at 2068. She is also not entitled to relief because she has not shown, as required by 28 U.S.C. § 2254(d), that the State court findings resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings. *Williams*, 529 U.S. at 402-03, 120 S. Ct. at 1517-18; *Childress*, 103 F.3d at 1224-25. Reasonable jurists considering the question would not agree that the state court ruling was incorrect. *Davis*, 158 F.3d at 812. Petitioner has failed to rebut the presumption of correctness owed to the trial court's factual findings with clear and convincing evidence to the contrary. *Valdez*, 274 F.3d at 947. State court findings supported by the record are owed deference by a federal district court. *Pondexter*, 346 F.3d at 149-152. Accordingly, the petition should be denied.

## Certificate of Appealability

An appeal may not be taken to the court of appeals from a final order in a habeas corpus

proceeding "unless a circuit justice or judge issues a certificate of appealability." 28 U.S.C. § 2253(c)(1)(A). Although Petitioner has not yet filed a notice of appeal, it is respectfully recommended that this Court, nonetheless, address whether he would be entitled to a certificate of appealability. *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (A district court may *sua sponte* rule on a certificate of appealability because "the district court that denies a petitioner relief is in the best position to determine whether the petitioner has made a substantial showing of a denial of a constitutional right on the issues before the court. Further briefing and argument on the very issues the court has just ruled on would be repetitious.").

A certificate of appealability may issue only if a petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). The Supreme Court fully explained the requirement associated with a "substantial showing of the denial of a constitutional right" in *Slack v. McDaniel*, 529 U.S. 473, 484, 120 S. Ct. 1595, 1604, 146 L. Ed.2d 542 (2000). In cases where a district court rejected a petitioner's constitutional claims on the merits, "the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.*; *Henry v. Cockrell*, 327 F.3d 429, 431 (5th Cir. 2003). "When a district court denies a habeas petition on procedural grounds without reaching the petitioner's underlying constitutional claim, a COA should issue when the petitioner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

It is respectfully recommended that reasonable jurists could not debate the denial of the Petitioner's § 2254 petition on procedural grounds, nor find that the issues presented are adequate

to deserve encouragement to proceed. *Miller-El v. Cockrell*, 537 U.S. 322, 327, 123 S. Ct. 1029, 134, 154 L. Ed.2d 931 (2003) (citing *Slack*, 529 U.S. at 484). Accordingly, it is recommended that the Court find that the Petitioner is not entitled to a certificate of appealability as to his claims.

## Recommendation

It is therefore recommended that the petition be denied and dismissed with prejudice. It is further recommended that a certificate of appealability be denied.

Within fourteen (14) days after receipt of the magistrate judge's report, any party may serve and file written objections to the findings and recommendations contained in the report.

A party's failure to file written objections to the findings, conclusions and recommendations contained in this Report within fourteen days after being served with a copy shall bar that party from *de novo* review by the district judge of those findings, conclusions and recommendations and, except on grounds of plain error, from appellate review of unobjected-to factual findings and legal conclusions accepted and adopted by the district court. *Douglass v. United Servs. Auto Ass'n*, 79 F.3d 1415, 1430 (5th Cir. 1996) (*en banc*).

**SIGNED this 1st day of March, 2011.**

_____

DON D. BUSH
UNITED STATES MAGISTRATE JUDGE